STATE OF CONNECTICUT *v.* EUGENE ONOFRIO

COTTER, C. J., LOISELLE, BOGDANSKI, LONGO and PETERS, Js.

Argued May 9—decision released September 4, 1979

*Ira B. Grudberg,* special public defender, with whom, on the brief, was *Jean L. Welty,* for the appellant (defendant).

*William F. Gallagher,* special assistant state's attorney, with whom, on the brief, was *Arnold Markle,* state's attorney, for the appellee (state).

LONGO, J.  In the early morning hours of June 9, 1972, James Cotter was discovered lying unconscious on East Town Road in Milford, suffering from multiple bullet wounds.  He was taken to Milford Hospital where he underwent surgery later that morning.  Between June 9 and June 14, his condition remained unstable, and by June 14, severe circulation problems had developed from a gunshot wound in the victim's right leg resulting in the amputation of his right leg on that day.  At the time of this operation, a massive abdominal infection was discovered in the area of the victim's rectum, which resulted in an extensive bloodstream infection, which in turn directly caused his death in the early afternoon of June 15, 1972.

The defendant, Eugene Onofrio, was indicted, together with Robert Celentano and Donald Perrotti, for the murder of James Cotter.  The defendants were tried together, and an initial trial failed to result in a jury verdict.  After a second trial, the jury returned a verdict finding the defendant Onofrio guilty of manslaughter in the first degree.  Celentano and Perrotti were acquitted.  From the judgment rendered, the defendant has appealed to this court.

In his appeal, the defendant challenges a number of the trial court's rulings relating to the admission of evidence, the cross-examination of witnesses, and the denial of a motion to suppress and a motion for a mistrial.  We shall discuss those issues and additional facts relating thereto which are necessary to the disposition of this appeal.

## I

We first address the defendant's claim that the court erred in admitting evidence which was alleged to be of no probative value and highly prejudicial in nature. Pertinent to that claim are the following facts: During a search of the defendant's home in East Haven on June 14, 1972, police officers seized a number of rifles, a pistol and a holster.[1] During a preliminary offer of proof, the state indicated that it would offer all of the evidence, including a holster, the rifles, a pistol and an ammunition clip, as stolen contraband. The defendant claimed that those items were irrelevant to the issues involved in the defendant's trial, and that the proffer of this evidence would be severely prejudicial. The court determined that the state would be permitted to inquire of witnesses with reference to the holster, but ruled that "any testimony with reference to the other guns" could not be adduced, as "the relevancy seems . . . to be rather remote on the basis of the indictment as it is here now." Following that ruling, and the resting of the state's case, the defense called the defendant's wife, Teresa Onofrio, and elicited from her, inter alia, that the holster, which had already been admitted as an exhibit and which prior testimony from a state's witness tended to establish was a .38 caliber pistol holster, was her son's and was used as a plaything by him. On cross-examination, the state, inquiring of Mrs. Onofrio how long the holster had been in the house, posited

---

[1] The warrant authorized the seizure of one item: a ".38 caliber handgun, Colt Special, long barrel." The propriety of the seizure of the rifles and other evidence was attacked by the defendant via a motion to suppress, which was denied. The defendant has assigned error to the trial court's ruling, which will be discussed in Part III, infra.

the question: "[W]hat else did the officers take out [of the house]?" Counsel for the defendant objected, the jurors were excused, and in the ensuing colloquy between counsel and the court, the state indicated that it intended to show what other weapons were found in the house, that the defense had "opened up" this line of inquiry and that the jurors were entitled to know that three rifles were found in the house. The court ruled that it would allow the prosecution to ask where the holster was located at the time of its seizure, but would not at any time allow the state to introduce the items, including the rifles that were obtained in the search, and that it was "foreclosing [the state] from bringing in the other items."

Immediately following the court's ruling, upon the resumption of cross-examination of Mrs. Onofrio by the state, the state offered two photographs for introduction into evidence. One photograph, state's exhibit AP, depicted a room used as a nursery in the Onofrio home, with several rifles leaning against one wall and a holster on top of a dresser. The other photograph, state's exhibit AQ, depicted the defendant's bedroom with a bureau drawer opened to reveal a handgun which was not the pistol for which the search warrant was issued. The defendant objected strenuously to the admission of the two photographs, claiming that they were irrelevant, and that their prejudicial impact far outweighed whatever probative value they might have. The state claimed in response that the photographs were admissible to impeach the credibility of Mrs. Onofrio insofar as she testified that the holster was her child's "plaything," and the court admitted the two photographs as full exhibits. The defendant claims that the admission of these photographs constitutes reversible error. We agree.

" 'Evidence as to articles found in the possession of an accused person subsequent to the time of the commission of a crime for which he is being tried is admissible only if it tends to establish a fact in issue or to corroborate other direct evidence in the case; otherwise the law does not sanction the admission of evidence that the defendant possessed even instruments or articles adapted to the commission of other crimes . . . . The reason is analogous to that applicable to evidence of other crimes committed by a defendant but unrelated to the offense under investigation.' *State* v. *Groos,* 110 Conn. 403, 407, 148 A. 350; see *State* v. *Brown,* 169 Conn. 692, 364 A.2d 186, and cases and authority therein cited." *State* v. *Acklin,* 171 Conn. 105, 114, 368 A.2d 212; see also *State* v. *Turcio,* 178 Conn. 116, 129, 422 A.2d 749; *State* v. *Hauck,* 172 Conn. 140, 144, 374 A.2d 150; *State* v. *Marshall,* 166 Conn. 593, 600, 353 A.2d 756. It is firmly established that evidence of criminal activities is generally inadmissible to prove the guilt of the defendant as to the crime charged. See, e.g., *State* v. *Brown,* 169 Conn. 692, 700–701, 364 A.2d 186; *State* v. *Holliday,* 159 Conn. 169, 172, 268 A.2d 368; *State* v. *Harris,* 147 Conn. 589, 599, 164 A.2d 399; McCormick, Evidence (2d Ed.) § 190, 1 Wharton, Criminal Evidence (13th Ed.) § 170; 1 Wigmore, Evidence §§ 192–194. Although such evidence may be admissible for other purposes, such as the impeachment of the defendant's credibility; *State* v. *Brown,* supra, 701; the general rule excludes the evidence so as to avoid "the danger of prejudice against the defendant which may result from the admission of such evidence. *State* v. *Gilligan,* 92 Conn. 526, 530, 103 A. 649." *State* v. *Brown,* supra, 700; see *State* v. *Carr,* 172 Conn. 458, 463–64, 374 A.2d 1107. The trial judge must determine, in

the exercise of judicial discretion, that the probative value of the "other crimes" evidence outweighs its prejudicial tendency. *State* v. *Turcio,* supra; *State* v. *Ralls,* 167 Conn. 408, 418, 356 A.2d 147; *State* v. *Moynahan,* 164 Conn. 560, 597, 325 A.2d 199, cert. denied, 414 U.S. 976, 94 S. Ct. 291, 38 L. Ed. 2d 219; cf. *State* v. *Piskorski,* 177 Conn. 677, 700–701, 419 A.2d 866.

Discretion, however, imports something more than leeway in decision-making. See *State* v. *Battle,* 170 Conn. 469, 365 A.2d 1100; *State* v. *Gilligan,* 92 Conn. 526, 103 A. 649; McCormick, Evidence (2d Ed.) § 190. " 'Discretion means "a legal discretion, to be exercised in conformity with the spirit of the law and in a manner to subserve and not to impede or defeat the ends of substantial justice. In a plain case this discretion has no office to perform, and its exercise is limited to doubtful cases, where an impartial mind hesitates." ' " *State* v. *Battle,* supra, 476; see *Hammerberg* v. *Leinert,* 132 Conn. 596, 604–605, 46 A.2d 420. When assessing the admissibility of "other crimes" evidence, the application of a mechanical test determining that the proffered evidence fits within some class of exception to the rule of nonadmissibility, may obscure sight of the underlying policy of protecting the accused against unfair prejudice. That policy ought not to evaporate through the interstices of the classification. The problem is thus one of balancing the actual relevancy of the "other crimes" evidence in light of the issues and the other evidence available to the prosecution against the degree to which the jury will probably be roused by the evidence. *State* v. *Holliday,* supra, 173; 6 Wigmore, Evidence (3d Ed.) § 1904. Put another way, if the issue to be proved is competent but can just as well be demonstrated by other evi-

dence, or if the evidence is of but slight weight or importance upon that point, a trial judge is justified in excluding the evidence entirely, if its probative value is marginal and its prejudicial tendencies clear. Such a balancing calls for a large measure of individual judgment about the relative gravity of imponderables. It should be recognized, however, that the discretion invested in the trial court is not a license to depart from the principle that evidence of other crimes, having no substantial relevancy except to ground the inference that the accused is a bad person and hence probably committed this crime, must be excluded. "The leeway of discretion lies rather in the opposite direction, empowering the judge to exclude the other-crimes evidence, even when it has substantial independent relevancy, if in his judgment its probative value for this purpose is outweighed by the danger that it will stir such passion in the jury as to sweep them beyond a rational consideration of guilt or innocence of the crime on trial. . . . A decision clearly wrong on this question of balancing probative value against danger of prejudice will be corrected on appeal as an abuse of discretion." McCormick, Evidence, op. cit. § 190.

With these principles in mind, we are constrained to conclude that the prejudicial effect of the photographs so far outweighed their minimal probative value in relation to the credibility of the defendant's wife that their admission into evidence constituted an abuse of the trial court's discretion. First, the photographs did not "tend to establish a fact in issue or to corroborate other direct evidence in the case"; *State* v. *Acklin,* supra; the rifles depicted in state's exhibit AP were not argued to have been employed in the shooting of the victim and the handgun depicted in exhibit AQ was not a .38 caliber pistol.

The photographs, furthermore, were not admissible within the exception permitting the introduction of "other crimes" evidence to impeach the testimony of the defendant: the photographs were not offered for that purpose. Second, at the time of the state's proffer of the photographs, the holster had already been received as a full exhibit, and an expert state's witness had testified extensively concerning the holster's characterization as a .38 caliber pistol holster. Thus, the jury had been fully apprised previously of the qualities of the holster, and the probative value of the photograph of the holster on the issue whether, in fact, it was a child's toy was, to that extent, diminished. While a photograph of the holster alone, although somewhat cumulative, may have properly been admitted, that holster may not be viewed in isolation from the photograph also depicting rifles unconnected with the crime. Most importantly, it had been established that the shooting in question was accomplished by means of .38 caliber pistol. The state never connected the fact of the defendant's possession of rifles with the commission of the crime for which he stood charged. In fact, the state did not claim that the weapons depicted in the photographs had anything whatsoever to do with the offense for which the defendant was being tried. Evidence as to the rifles found in the defendant's home was "irrelevant and prejudicial when the state failed to produce evidence connecting the [rifles with the shooting of the victim]." *State* v. *Johnson,* 160 Conn. 28, 32, 273 A.2d 702; see *State* v. *Ferraro,* 160 Conn. 42, 45, 273 A.2d 694. Absent such a connection, the balance of scales clearly tips against the probative value of the evidence.

The state nevertheless contends that the photographs were admissible to show that, since the

defendant evidently possessed a collection of rifles and handguns, the defendant possessed the means of committing the crime. We disagree. As the state never connected the presence of the rifles in the defendant's house with the crime charged, and it was shown that the shooting in question was effectuated by means of a .38 caliber handgun, and not the handgun shown in state's exhibit AQ, the admission of the photograph of the several rifles and holster, and the photograph of the handgun, was not "relevant to show that [the defendant possessed] the means to commit the crime [charged]." See *State* v. *Villafane,* 171 Conn. 644, 675, 372 A.2d 82.

The prejudicial effect of the admission of these two photographs is apparent. On cross-examination of the defendant by the state later in the trial, the defendant was faced with a full recounting, in the presence of the jury, over defense objection, of the police search of his home, and the finding of all of the weapons. The defendant was asked whether the weapons were registered, how long they had been there, whether he had a hunting permit for the rifles, and how many weapons he had in the house. Moreover, in extensively reviewing the transcript, it is quite clear that the significance of this evidence against the defendant Onofrio was illuminated by the fact that it was notably absent from the state's case against Onofrio's codefendants. This distinction in the state's case as against the different defendants could easily have influenced the jury: the defendants Celentano and Perrotti were acquitted. " 'Any improper evidence that may have a tendency to excite the passions, awaken the sympathy, or influence the judgment, of the jury, cannot be considered as harmless.' " *State* v. *Loughlin,* 149 Conn. 21, 26, 175 A.2d 367; see *State* v. *Acklin,* supra,

115–16, *State* v. *Ferraro,* supra, 45. At the very least the jury could have believed that the defendant was a violent individual. Id. 45–46. The inflammatory nature of the photographs may well have affected the jury's judgment. The court erred in admitting the photographs into evidence and the error cannot be considered harmless. *State* v. *Acklin,* 171 Conn. 105, 116, 368 A.2d 212; *State* v. *Ferraro,* 160 Conn. 42, 45, 273 A.2d 694; *State* v. *Johnson,* 160 Conn. 28, 33, 273 A.2d 702.

As a new trial must necessarily be ordered, we will limit our consideration of the remaining assignments of error to a discussion of those claims which will most likely arise upon remand.

## II

The defendant's second claim is that the trial court erred in refusing to mark certain proffered exhibits for identification. The defendant had issued subpoenas duces tecum to Peter Seaha of the department of corrections and to Thomas Degnan of the department of adult probation, commanding their appearance at trial. Seaha was to appear with a copy of the victim's prison record, which record was alleged to have included a psychiatric evaluation of the victim indicating that he was a psychopathic or sociopathic personality. Degnan was to testify in relation to presentence investigation reports containing information purportedly contradicting certain testimony given by a state's witness. The state orally moved to quash both subpoenas, and both motions were granted by the court. Following the court's ruling, counsel for the defendant attempted to have both reports marked for identification and admitted as exhibits, and stated to the court as his reason the importance of the documents being marked in the event the court ultimately excluded

the documents and the defendant appealed on the issue of their exclusion. In the ensuing colloquy, defense counsel made an offer of proof as to both of the records, indicating the purposes for which he sought admission of the records. The trial court, however, excluded the documents[2] and would not allow them to be marked for identification.

The right to have a proffered exhibit marked for identification is indeed a broad one. An object or document excluded from evidence should be marked by the trial court as an exhibit for identification in order to preserve it as part of the record and to provide an appellate court with a basis for review. *Drazen Lumber Co.* v. *Casner,* 156 Conn. 401, 405–406, 242 A.2d 754. A trial court's refusal to permit documents to be marked as exhibits for identification is "manifest error." *Duncan* v. *McTiernan,* 151 Conn. 469, 470, 199 A.2d 332. In *Duncan,* we stated (p. 470) that "[t]he court had no discretion to refuse such a request, because to allow such discretion would permit a trial judge to deprive an aggrieved party of a proper record for appeal." Accord *Norwich Roman Catholic Diocesan Corporation* v. *Southern New England Contracting Co.,* 164 Conn. 472, 478, 325 A.2d 274; *Drazen Lumber Co.* v. *Casner,* supra, 405–406; *National Broadcasting Co.* v. *Rose,* 153 Conn. 219, 227, 215 A.2d 123. The proffered records in the instant case, not having been marked for identification, are not a part of the record on this appeal and therefore are not available for examination by this court to determine whether the trial court made a proper ruling in excluding them as full exhibits. *Sickmund* v. *Connecticut Co.,* 122 Conn.

---

[2] The defendant assigns independent error to the trial court's exclusion of the documents, which will be discussed in the context of the issue presently under consideration.

375, 382, 189 A. 876; *Davis* v. *Greenstein,* 112 Conn. 530, 535, 153 A. 161; *Roberti* v. *Barbieri,* 105 Conn. 539, 543, 136 A. 85. Under the circumstances, we conclude that the trial court erred in refusing to mark the proffered records for identification. *Duncan* v. *McTiernan,* supra, 470.

The defendant makes the further related claim that the court erred in refusing to admit the victim's prison record, a portion of which concerned his diagnosis as a psychopathic or sociopathic personality, for the purpose of impeaching his credibility. Much of the state's case against the defendant was based upon accusatory statements made by the victim between the time of his admittance to the hospital and his death seven days later. Those statements were admitted by the court as within various exceptions to the hearsay rule, the propriety of which is discussed, infra. The defendant claims that impeachment of a hearsay declarant, particularly as to a hearsay declarant's dying declarations, is uniformly allowed. See *Taborsky* v. *State,* 142 Conn. 619, 629, 116 A.2d 433; *State* v. *Vaughn,* 171 Conn. 454, 460, 370 A.2d 1002; 5 Wigmore, Evidence, (Chadbourn Rev. 1970) § 1446; 2 Wharton, Criminal Evidence (13th Ed. Torcia) § 347 (impeachment of dying declarations). Although counsel for the defendant made an offer of proof concerning the prison record psychiatric evaluation, and represented to the court the purposes underlying its proffer, we cannot determine, from that limited offer of proof, the contents of the report and hence the extent of the relevance the report would have carried had it been marked for identification and received as an exhibit. See *State* v. *Grimes,* 154 Conn. 314, 320, 228 A.2d 141. Neither does our disposition of other issues in this case render the admis-

sibility of the record immaterial to this appeal. See *Norwich Roman Catholic Diocesan Corporation* v. *Southern New England Contracting Co.*, supra, 478. We thus conclude that, absent a marking of the record for identification, and because of the limited offer of proof appearing in the transcript, we have no basis upon which to determine the propriety of the court's ruling excluding the record. The trial court, upon the remand in this case, must determine whether the record, if offered, is admissible, in light of the principles of law we have discussed above.

## III

The defendant next argues that the court erred in denying his motion to suppress certain property seized in the June 14, 1972 search of his home. As we have previously discussed, the defendant's home was searched, pursuant to a search warrant authorizing the seizure of a ".38 caliber handgun, Colt Special, long barrel." The officers executing the warrant, in the course of their search, discovered a number of rifles, an automatic pistol with clip, a box of cartridges and a shoulder holster. The defendant claims that, because of the "specificity requirement" of the fourth amendment,[3] which has, with pertinent exceptions, been construed generally to prohibit the seizure of one thing under a warrant describing another; see *Marron* v. *United States*, 275 U.S. 192, 196, 48 S. Ct. 74, 72 L. Ed. 231; *Stanley* v. *Georgia*, 394 U.S. 557, 571, 89 S. Ct. 1243, 22 L. Ed. 2d 542 (*Stewart, J.*, concurring); the seizure of articles other than the item described in the warrant was

---

[3] The fourth amendment to the United States constitution provides, in pertinent part, "no Warrants shall issue, but upon probable cause, supported by oath or affirmation, and *particularly describing* the place to be searched, and the person or things to be seized." (Emphasis added.)

impermissible. We need not address, however, in
a fourth amendment context, the defendant's present
argument, with the exception of the claim relating
to the seizure of the shoulder holster which was
admitted into evidence. No physical item seized,
except the holster, was admitted by the trial court
against the defendant. The trial court quite prop-
erly excluded as evidence against the defendant the
rifles, the automatic pistol and clip and the box of
cartridges on the ground that they were not relevant
to the crime for which the defendant stood charged.
See *State* v. *Acklin,* 171 Conn. 105, 114, 368 A.2d
212, and our discussion and authorities cited in part
I of this opinion. Thus, those items having been
excluded at trial, any error under the fourth amend-
ment in the search for and seizure of these particular
items was rendered harmless. See W. LaFave,
Search and Seizure, A Treatise on the Fourth
Amendment (1978) § 11.6; cf. *State* v. *Moye,* 177
Conn. 487, 509 n.5, 418 A.2d 870. Having con-
cluded that the trial court properly excluded the
physical items, and additionally having determined
that the admission of the two photographs depicting
several of these items was error, the items seized
(with the possible exception of the holster) were not,
under the law of evidence, admissible against the
defendant.[4] Consideration of the fourth amendment
claim is consequently rendered inappropriate:
"[c]onstitutional issues are not considered unless

---

[4] As to the fourth amendment aspect of the defendant's claim
relating to the admission of the two photographs, we note only that
the prosecution clearly may not accomplish by indirection what it
may not do directly: if the articles depicted in the photographs
*were* illegally seized, photographs of those articles could not be used
affirmatively against the defendant. *State* v. *Hunt,* 280 S.W.2d 37
(Mo.); *People* v. *Berger,* 44 Cal. 2d 459, 282 P.2d 509; W. LaFave,
Search and Seizure, A Treatise on the Fourth Amendment (1978)
§ 11.6, p. 699; see cases collected in annot., 50 A.L.R.2d 531, 567–68.

absolutely necessary to the decision of a case."
*State* v. *DellaCamera,* 166 Conn. 557, 560–61, 353
A.2d 750; 16 Am. Jur. 2d, Constitutional Law, §§ 111,
113; see *Pi* v. *Delta,* 175 Conn. 527, 534, 400 A.2d
709; *Ashwander* v. *Tennessee Valley Authority,* 297
U.S. 288, 346–47, 56 S. Ct. 466, 80 L. Ed. 688
(Brandeis, J., concurring).

We do address, however, the defendant's claim in
relation to the holster admitted into evidence. The
trial court determined that the holster was an instru-
mentality of the crime charged. While it is well
settled that some objects, including instrumental-
ities of the crime charged, not particularly described
in a warrant, may be seized by those executing the
warrant; see *State* v. *Johnson,* 162 Conn. 215, 220–23,
292 A.2d 903, quoting *Harris* v. *United States,* 331
U.S. 145, 154, 67 S. Ct. 1098, 91 L. Ed. 1399, rehear-
ing denied, 331 U.S. 867, 67 S. Ct. 1527, 91 L. Ed.
1871; we cannot agree with the trial court's deter-
mination that the holster seized was an instrumen-
tality of the crime charged.

At the time of the search of the defendant's home
in June of 1972, the pertinent portion of General
Statutes § 54-33a authorized the issuance of a search
warrant for the seizure of property "(1) possessed,
controlled, designed or intended for use or which is
or has been used or which may be used as the means
of committing any criminal offense." General Stat-
utes § 54-33a (b) (1) (Rev. to 1977). It is thus
apparent that a search warrant, in 1972, could not
be issued for the seizure of items which were of
mere evidentiary value.[5] In the present case, the

---

[5] General Statutes § 54-33a was amended in 1977, Public Acts 1977,
No. 77-504, to provide that a warrant may be issued for the seizure
of property "which constitutes evidence of an offense, or that a par-
ticular person participated in the commission of an offense."

"means of committing . . . [the] offense" consisted of a .38 caliber handgun, for which the police unsuccessfully searched. The holster, contrary to the trial court's conclusion, was not "contraband"; see *State* v. *Johnson,* 162 Conn. 215, 221, 292 A.2d 903; neither was the holster "property . . . which may be used as the means of committing any criminal offense." As such, the holster was merely evidential material which could not be seized under the authority of the warrant issued. *State* v. *Johnson,* supra, 221–22.

The state claims, however, that the warrantless seizure of the holster was permissible under the so-called plain view doctrine, which makes permissible, with certain limitations, the seizure of items found by the police while executing a warrant naming other objects. See, generally, W. LaFave, Search and Seizure, A Treatise on the Fourth Amendment (1978) § 4.11; annots., 29 L. Ed. 2d 1067; 79 A.L.R.2d 1005, 1013 § 3; 68 Am. Jur. 2d, Searches and Seizures §§ 88, 113. It does not constitute a "search" within the meaning of the fourth amendment, merely to observe what is in plain view: objects falling in the plain view of a police officer who has the right to be in a position to have that view are subject to seizure and may be introduced into evidence. *Harris* v. *United States,* 390 U.S. 234, 236, 88 S. Ct. 992, 19 L. Ed. 2d 1067; *State* v. *McClain,* 171 Conn. 293, 298, 370 A.2d 928; *State* v. *Watson,* 165 Conn. 577, 587, 345 A.2d 532. When the police have a warrant to search a given area for specified objects, and in the course of the search come across some other article of incriminating character in plain view, they may observe and seize that article. *Coolidge* v. *New Hampshire,* 403 U.S. 443, 465, 91 S. Ct. 2022, 29 L. Ed. 2d 564; *State* v. *Cobuzzi,* 161 Conn. 371, 377, 288 A.2d 439, cert. denied, 404

U.S. 1017, 92 S. Ct. 677, 30 L. Ed. 2d 664; *State* v. *Smith,* 157 Conn. 351, 355, 254 A.2d 447. "What the 'plain view' cases have in common is that the police officer in each of them had a prior justification for an intrusion in the course of which he came inadvertently across a piece of evidence incriminating the accused. The doctrine serves to supplement the prior justification . . . and permits the warrantless seizure. Of course, the extension of the original justification is legitimate only where it is immediately apparent to the police that they have evidence before them; the 'plain view' doctrine may not be used to extend a general exploratory search from one object to another until something incriminating at last emerges." *Coolidge* v. *New Hampshire,* supra, 466; see 68 Am. Jur. 2d, Searches and Seizures § 88.

In the present case, it is not disputed that the police officers executing the warrant had, by virtue of that warrant, a legitimate "prior justification" for being in a position to view the holster. It cannot be seriously contended that the observation of the holster was not inadvertent: the officers did not know of the existence of the holster, but sought only a .38 caliber handgun. Thus the issue becomes whether the "incriminatory nature" of the holster was "immediately apparent" to the searching officer. In connection with this point, it has been said that objects not named in the warrant, but found within an officer's plain view, may be seized if the objects "clearly and definitely relate to the behavior which prompted the issuance of the search warrant"; *State* v. *Michaelson,* 298 Minn. 524, 527, 214 N.W.2d 356; or if the officers "had a reasonable basis for believing that the seized evidence was reasonably related to the offense which formed the basis for the search

warrant." *Chambers* v. *State,* 508 S.W.2d 348, 353 (Tex. Crim. App.) ; see *Phenix* v. *State,* 488 S.W.2d 759 (Tex. Crim. App.) ("reasonable connection" to search); *United States* v. *Wolfe,* 375 F. Sup. 949 (E.D. Pa.) ("reasonable relation to purpose of the search"); *United States* v. *Barber,* 495 F.2d 327 (9th Cir.) ("nexus" between seized item and purpose of search); see *United States* v. *Golay,* 502 F.2d 182 (8th Cir.). The requirement for a plain view seizure thus appears, in short, to be probable cause to believe that the item seized is reasonably related, in an evidentiary sense, to the commission of the crime. See W. LaFave, Search and Seizure, A Treatise on the Fourth Amendment § 4.11 (b). In view of this standard, under any of the cases cited above, the plain view seizure of the holster had a reasonable relation to the shooting which formed the basis for the issuance of the warrant. As to the seizure of the holster, consequently, the trial court did not err in denying the defendant's motion to suppress.

## IV

We finally consider the defendant's claim that the trial court erred in admitting three sets of allegedly hearsay statements made by the deceased. Pertinent to that claim is the following brief factual synopsis: At approximately 5 :45 a.m. on the morning of June 9, 1972, between three and four hours after the approximate time of the shooting incident at 2 :15 a.m., the victim's sister, Catherine Hemstock, arrived at the Milford Hospital, where the victim had been transported after the shooting. Hemstock was permitted to testify over defense objection that, at that time, while the victim was undergoing medical treat-

ment in the emergency room, in response to Hemstock's question, "Who did it?" the victim responded, "Suedes, Skippy Perrotti and Eugene Onofrio, Rooster." Hemstock further testified that the victim said "he wasn't going to make it." Shortly thereafter, at approximately 6 a.m., the victim was joined in the emergency room by his attorney, Francis J. McQuade. McQuade testified that the victim stated to him, inter alia, that "Rooster [Onofrio's nickname] shot me three times," that all three defendants were involved in the shooting and that he had been run over with a car, and that he did not think he was going to make it. The court admitted the victim—Hemstock and the victim—McQuade conversations as spontaneous utterances and as part of the res gestae. The victim's sister, Catherine Hemstock, testified further, over defense objection, that on the next day, June 10, the victim stated that he had seen Onofrio with a gun and that Onofrio had shot him and that he again stated that "he knew he wasn't going to live." Finally, Attorney McQuade and Officer Nicholas Pastore of the New Haven police both testified, over defense objection, that sometime after noon on June 15, approximately one hour before the victim died, McQuade asked the victim if he understood that he was in danger of dying and that he had replied, "Yeah"; that Pastore had told the victim that he was dying, that there was no hope of recovery, and that he would shortly die; that the victim understood this; that the victim then stated "Rooster [Onofrio] shot me three times," and further stated "Frankie [McQuade], I've told you this before." The court admitted these statements as dying declarations, and the defendant claims that the court's action in this respect constituted reversible error. We disagree.

The law is clear that "a declaration not admissible because, at the time of making, the declarant did not believe he was going to die, may become admissible by affirmation at a later time when the declarant has become aware that he was dying, by referring expressly to such earlier declaration and affirming as to its truth. In such case, both the original declaration and the affirming statement would be admissible." 2 Wharton, Criminal Evidence (13th Ed.) § 326; see *State* v. *Yochelman,* 107 Conn. 148, 153–54, 139 A. 632; annot., 53 A.L.R.3d 785 § 11; 104 A.L.R. 1319 (collected cases). For example, in *State* v. *Brown,* 296 N.W. 582 (Minn.), the court held that a statement which lacked the necessary foundation for admissibility at the time it was made was admissible when it was subsequently reaffirmed or reiterated as part of a dying declaration having the necessary predicate and which is itself admissible. In *State* v. *Yochelman,* supra, we upheld the determination of a trial court finding that a statement made with a consciousness of impending death which reaffirmed a prior statement implicating the defendant in the crime was a qualified dying declaration. Both statements were admitted. In view of the above evidentiary principle, we are thus required to decide only whether the victim's statements to McQuade and Pastore on June 15, 1972, the day of the victim's death, were properly admissible as dying declarations. We agree with the trial court's conclusion determining that these statements were admissible dying declarations.

Under our law, a victim's statement may be admissible, in a criminal prosecution for the victim-declarant's death; Tait & LaPlante, Handbook of Connecticut Evidence § 11.7 (b); as a dying declaration if (1) the declarant was conscious of

impending death and (2) the statement concerns the cause of death or the circumstances surrounding the death. *State* v. *Manganella,* 113 Conn. 209, 215–16, 155 A. 74; *State* v. *Perretta,* 93 Conn. 328, 337, 105 A. 690; see, generally, 5 Wigmore, Evidence (3d Ed.) § 1446; 2 Wharton, Criminal Evidence, op. cit., §§ 315–21; McCormick, Evidence (2d Ed.) §§ 281–86, Tait & LaPlante, supra, § 11.7. The victim made the statements accusing the defendant as the person who shot him to McQuade and Pastore around 12:30 p.m. in the afternoon on which he died at 1:06 p.m. At that point, the victim's condition had rapidly deteriorated: his body temperature was reported to be between 106–107 degrees, his blood pressure was unsteady and wavering, he was experiencing respiratory difficulties and his condition was stated to be "terminal" by his attending physician. McQuade testified that the victim responded affirmatively when asked if he understood that he was in danger of dying; Officer Pastore testified that the victim indicated in response to Pastore's questions that he understood that he was dying, that there was no hope of recovery and that he would soon die. Officer Pastore then asked the victim who had shot him and the victim had replied, "Rooster [Onofrio] shot me three times, Skippy [Perrotti] shot me twice and Suedes [Celentano] hit me with the car." In this context, we cannot say that the trial court erred in determining that the victim was conscious of impending death, and that his statements concerned the cause of his death. A dying declaration may be made in the form of questions and answers; *State* v. *Manganella,* supra, 216; Tait & LaPlante, supra, § 11.7 (d); and the declarant's consciousness of despair over impending death may be proved by the circumstances surrounding the

declaration as well as by the statements themselves. Wharton, Criminal Evidence, op. cit., § 324; see *Shepard* v. *United States,* 290 U.S. 96, 99–100, 54 S. Ct. 22, 78 L. Ed. 196; 5 Wigmore, Evidence (3d Ed.) § 1442. There is no talismanic ritual of words that must be spoken by a dying declarant; see Wharton, Criminal Evidence, op. cit., § 323; and the opinion of the declarant's attending physician, coupled with the dying person's statements and surrounding circumstances, may form a sufficient basis upon which to rest an evidentiary determination that the dying statements are admissible. Id., § 325.

It is apparent, moreover, that the victim, in his statements on June 15, expressly referred to the earlier statements made to his attorney, McQuade, and to his sister and others accusing the defendant of perpetrating the shooting which resulted in his death. The victim stated "I told Frank [McQuade] already," and "Frankie, I've told you this before. I've told you this before." Thus, the victim's June 15 statement, being a qualified dying declaration, was admissible. Since, moreover, it constituted a reaffirmation of the previous statements the victim had made accusing the defendant of complicity in the shooting, those statements were similarly admissible. Wharton, Criminal Evidence, op. cit., § 326.

The other assignments of error are not of sufficient moment to require discussion. In none does there appear to be harmful error.

There is error in part, the judgment is set aside and a new trial is ordered.

In this opinion the other judges concurred.