[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The defendant, John Krukowski, has filed a motion requesting the court to order that all items of property seized from him and/or his home on or about January 31, 1994 and February 2, 1994 be returned to him and to suppress all such items that the State seeks to introduce as evidence against him at the defendant's criminal trial. Subsequent to the filing of the defendant's motion, the State and the defendant came to an accord regarding the items seized on February 2, 1994. Therefore, this Memorandum is confined the seizure of January 31, 1994.
On January 25, 1995 the court heard testimony concerning the defendant's motion. Given the passage of time, the parties CT Page 1420-WW submitted a transcript of that partial hearing for the court's review. cf. State's Exhibit 11. Additionally, the parties, through counsel, have submitted a Stipulation of Facts regarding the defendant Krukowski's motion. Cf. Court Exhibit 1.
Based on the evidence adduced at the hearing and the stipulation of facts, the court makes the following findings and order.
On January 31, 1994 Detective Don Skewes of the Vernon Police Department met with Juvenile Court Advocate Joseph Kristan concerning a fifteen year old juvenile, M., who had run away from Vernon and had been located in Cape Cod, Massachusetts. The detective had earlier spoken with M.'s mother, Marie Riccio, who had reported M. as a runaway. The Juvenile Court Advocate Kristan told Detective Skewes that he had a conversation with a Juvenile Prosecutor, Roger Jackson, from Cape Cod who reported to him that M. had revealed to the Juvenile Prosecutor that she had gone through photographic sessions with her Agent John Krukowski and that some of the photos were of M. semi-nude. Skewes then spoke directly with Jackson who informed him that M. had reported to Jackson that she had received training as a model at age (14) fourteen. She indicated that during January of 1994 she hired John Krukowski as her agent and Krukowski made arrangements with a photographer Paul Duckett to have photo sessions with M. at her home. M. further reported to Jackson that these sessions consisted of photos of M. dressed in clothing, bathing suits, lingerie and also semi-nude. M. also indicated to Jackson that her mother had given written permission for her to participate in these photo sessions. M. identified the location of the photo sessions as Unit 355 in the Ryefield II Condos, Vernon Connecticut, and she gave her mother's address as 42 Rangehill Drive, Vernon, Ct.
Detective Skewes also spoke directly with M. who indicated to her that Krukowski lives in Unit 355 of the Ryefield II Condos and that the photo sessions as well as a video took place in the cellar of the condo. Additionally, she indicated that some photos were taken at her mother's house at 42 Rangehill Drive, Vernon. She stated that the photo's taken at her mother's house included poses in lingerie, bathing suits, as well as semi-nude. She indicated that the photos were taken by Paul Duckett and that Krukowski took the video. She estimated that sixty (60) to eighty (80) photos were taken of her during the month of January 1994. She also indicated while she had a few of these photos, Duckett and Krukowski had the majority. CT Page 1420-XX
In her conversation with Detective Skewes, M. also explained that Krukowski runs a "Philippine Dating Service" business out of his Vernon condo and that in this company, called "Asian Mystique", Krukowski deals primarily with Philippine and Asian women.
Skewes later received a phone call from the defendant Riccio asking about the case and the police intentions. In this conversation, Skewes explained to her his concern with the semi-nude photography and the video with M. in her lingerie. In this conversation Riccio confirmed to Skewes that she had authorized these photos and video for M. and that she was aware that there may be some nudity involved but she felt the photos of M. nude were tastefully done. In this conversation Riccio indicated that M.'s portfolio was at her home and that the detective was welcome to it. During this conversation Riccio informed Skewes that she had already contacted Krukowski and had informed him of the police investigation.
Subsequently, Detective Skewes and Lieutenant Greenier went to Krukowski's residence at the Ryefield Condos. They knocked on the door and were greeted by Krukowski to whom they identified themselves as police officers wishing to speak with him. Krukowski opened the door and allowed the officers entry to him home while indicating that he had been expecting them and was willing to cooperate with the investigation. In conversation Krukowski indicated that he runs a Philippine correspondence service, a listing of women who men can write to overseas. He also indicated that he was starting a modeling agency and was trying to find suitable models. Krukowski then freely showed the officers six (6) black and white photos of M., three of which showed her partially nude. One of the photos was a side view of M. with no top on. This photo showed the side view of M.'s right breast. The other two photos showed her standing with an unbuttoned silk shirt and panties on with both breasts partially exposed. Krukowski also showed the officers several contracts which were in his computer. These contracts indicated that M. was fifteen years old, that her mother, defendant Riccio, was giving permission for the photos to be taken. The contracts also contained a provision allowing semi-nude photographs to be taken.
During this conversation Krukowski told the officers about a video tape he had made of M. at his condo in which she was modeling bikini bathing suits, lingerie, and other clothing. The officers viewed the video. During the video Krukowski can be heard to tell CT Page 1420-YY M. to "seduce the Camera', to "act Sexy", to "Run your hand over your body and entice me like you want to. . .". In this video Krukowski zooms in to show close up shots of M.'s breasts and genital area. Krukowski asks M. in the video if she shaves her legs and questions her "What about up around . . .? You do a lot of trimming up top?" In this questioning he was referring to the pubic area. During this video the officers could see strobe flashes and hear the sound of the automatic winding motor of a camera after each flash.
Upon viewing the video and photographs the officers determined that they were criminal in nature. Additionally, they decided that the written contracts were evidence of criminal activity. These items were seized.
During this visit to Krukowski's home he indicated that approximately eighty photographs had been taken of M., and that most of the negatives, proofs and contracts of M. were in the possession of Duckett. He indicated that Duckett uses these photographs for his portfolio as a professional photographer.
In Krukowski's residence, the computer system was in plain view. Additionally, he voluntarily showed his studio room to the officers. While they were present in Krukowski's home they noted the video camera used for Krukowski's modeling sessions lying on the couch in the living room. From Krukowski's home the officers seized the property listed as Attachment A-2 to Court Exhibit 1, the parties Stipulation of Facts regarding this motion.
The defendant claims that the seizure of the items enumerated on Attachment A-2 of Court Exhibit 1 violates both his State as well as Federal Constitution rights. Article 1, Section Seven of the Connecticut Constitution provides, in part, that "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures . . ." The Fourth Amendment to the United States Constitution provides, in part, that, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . ." It is a basic constitutional rule that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under theFourth Amendment-subject only to a few specifically established and well defined exceptions". Coolidge v. New Hampshire, 403 U.S. 443
(1971). Where there has been a seizure of property without a warrant, it is incumbent upon the State to provide justification. CT Page 1420-ZZ
Under the facts of this case the court finds that the Vernon police officers did not discover the disputed items while conducting a search of the defendant Krukowski's residence. The discovery by the officers of items they then determined to seize while lawfully in the defendant's residence for the purpose of interviewing him and not for the purpose of searching his residence did not constitute a search. It is undisputed that the officers were granted access to the defendant's residence voluntarily. The court finds additionally that the defendant voluntarily initiated the officers' observations of the disputed items by showing them to the officers. When a police officer observes items in open view, that observation does not constitute a search. State v. Hobson,8 Conn. App. 13 (1986). When items are found to be in plain view, the Connecticut Supreme Court has countenanced their seizure where the initial intrusion is lawful, discovery of the evidence is inadvertent, and the seizing officers have reason to believe that the seized items are evidence of a crime. State v. Pepe, 176 Conn. 75
(1978). In Pepe, the items which the police had reason to believe were evidence of a crime were, in fact, reasonably believed by the police to be stolen goods. Id at 79. Pepe, therefore, is not inconsistent with dicta in a later Appellate Court decision inState v. Vincent, that two requirements which must be met to invoke the plain view doctrine are that the initial intrusion that enabled the police to view the items seized must have been lawful, and the police must have had probable cause to believe that these items were contraband or stolen goods. State v. Vincent, 30 Conn. App. 249,259 (1993), Affirmed, 229 Conn. 164 (1994). Since the seized item in Vincent was, in fact, contraband, Vincent did not reach the question presented in this case. The issue was, however, discussed directly by the State Supreme Court in State v. Reddick, 207 Conn. 323, (1988). In Reddick, the Court discussed the police seizure of an individual's personal property and a trash bag taken while the police were searching for a shotgun and sunglasses. The Court opined, "When the police have prior justification for an intrusion and inadvertently come across items of immediately apparent evidentiary value in plain view they may seize those items. (citations omitted) The police meet the "immediately apparent" requirement if, on discovery, they have probable cause to associate the property in plain view with criminal activity without further investigation." (Citations omitted) Id at 335. Similarly, the Appellate Court has opined that where the seized object is evidence, as opposed to contraband, the police must have probable cause to believe that it was "reasonable related, in an evidentiary sense, to the commission of the crime." State v. Hobson, 8 Conn. App. 13
CT Page 1420-AAA (1986), citing State v. Onofrio, 179 Conn. 23 (1979). In analyzing the Fourth Amendment protection against unwarranted seizure, the United States Supreme Court opined, "Nothing in the language of the Fourth Amendment supports the distinction between `mere evidence' and instrumentalities, fruits of crime, or contraband." Warden v. Hayden, 387 U.S. 294 (1967).
In this case the police were invited into the defendant's residence. Their intrusion was justified. The court finds, also, that their discovery of the seized items was inadvertent. There was no evidence that the police had known for certain what they might see at the defendant Krukowski's residence; nor was there any evidence that the police had formulated an intent before their arrival to make a seizure of any objects once at the defendant's residence. cf. Coolidge v. New Hampshire, 403 U.S. 443, 472 (1971). Finally, based on the court's examination of the items seized, as well as the testimony adduced at the hearing on this matter, the court finds that the police reasonably concluded, once shown the items by Krukowski, that they were reasonably related to the commission of a crime.
Accordingly, the defendant Krukowski's Motion for Return of Seized Property is denied.
Bishop, J.