## STATE OF CONNECTICUT v. LLOYD BRAMAN
(10040)

PETERS, HEALEY, PARSKEY, SPONZO and COVELLO, Js.

Argued October 14—decision released December 27, 1983

*Jon C. Blue,* assistant public defender, for the appellant (defendant).

*Lawrence J. Tytla,* deputy assistant state's attorney, with whom were *Thomas P. Miano,* assistant state's attorney, and, on the brief, *John M. Bailey,* state's attorney, and *Carl Schuman,* assistant state's attorney, for the appellee (state).

ARTHUR H. HEALEY, J. The defendant, Lloyd Braman, was convicted by a jury of robbery in the first degree in violation of General Statutes § 53a-134 (a) (4), which crime occurred on March 4, 1979, at the Brass Hammer Cafe in Manchester. On appeal, the defendant claims that the trial court erred in admitting evidence concerning (1) a prior uncharged act of robbery and (2) the conduct and state of mind of the defendant's girl friend subsequent to the robbery of which he was found guilty. We find no error.

The jury could reasonably have found the following facts: The Brass Hammer Cafe in Manchester was a small establishment approximately forty feet long. On Sunday, March 4, the date of the Brass Hammer robbery, the state's witness, David Marsh, stopped at the Brass Hammer twice, with his second visit occurring at about 10:30 p.m. His girl friend, Susan MacComber,

was with him at that time, but she refused to go inside and waited for him in his van. After being inside for ten to fifteen minutes, Marsh came outside to enter his van and he met the defendant in the parking lot. The defendant asked Marsh what was going on inside and he replied that it was "dead." At that time, the defendant, according to Marsh, was alone, unmasked and unarmed. The robbery occurred shortly thereafter at approximately 11 p.m. as the bar was closing, at which time there were six people inside.[1]

As Paul Mahoney, one of the bartenders, was emerging from the rear storage room with the money bag containing the day's receipts tucked under his arm and a six-pack of beer, a man wearing a ski mask that completely covered his face came in the front entrance of the bar. He carried a single-barrel pump-action shotgun on which the stock and part of the barrel had been cut off. He said: "This is a holdup," and he asked Daniel Faber, a customer, where the money was. After Faber indicated that it was at the other end of the bar, the masked man started in that direction. As he did so, a woman entered. She wore a hat and scarf across her face so that only her eyes were visible. She carried a small automatic handgun. She stood by the front door, covering the people in the vicinity, and said, "[n]o one move."

Mahoney heard Faber yell "Paul" and saw the masked man running toward him. He approached to within one foot of Mahoney and pointed the barrel of the shotgun at him so that it was "no more than an inch" from his nose. At that point, they were face to face "for fifteen or thirty seconds." Mahoney then

---

[1] These included Paul Mahoney and Gary Dumas who were bartenders, David Seymour and Daniel Faber who were customers, and Cindy Lee Allen and Susan Clough who were two dancers who had performed there that evening.

dropped the money bag and the six-pack of beer, grabbed the barrel of the shotgun and pushed the man into a jukebox. They struggled and fell to the floor. Mahoney heard the woman yell, "[s]top or I'll start shooting." During the struggle, the man's mask fell off. Mahoney faced the unmasked robber for twenty or thirty seconds and he recognized him as a customer who had come into the Brass Hammer "just about every time [he] worked."[2] Mahoney said that when the man came he always came in with a friend of his whose name was Dave.[3] He observed the robber to be a caucasian male with black hair and a goatee and mustache. The six persons in the bar were then ordered into the rear storage room where they remained approximately five minutes until a driver, who came to transport the two dancers, arrived and released them. Mahoney called the Manchester police and reported the robbery. Later that night Mahoney selected the defendant's photograph from a book of mug shots at the police station.[4] No other person in the Brass Hammer during the robbery was able to make an identification of either of the robbers. Marsh, the defendant, and their girl friends, Susan MacComber and Kathleen Jourdenais, spent that night in MacComber's apartment. On the afternoon of the following day, the four of them left Connecticut in Marsh's van.

After the photographic identification by Mahoney, the Manchester police, failing to locate the defendant, issued a nationwide teletype for him on March 5, 1979. Four days later a response was received from authorities in Colorado who had stopped a step van owned by

[2] Mahoney had worked at the Brass Hammer for three or four months before March 4, 1979, and he only worked on Saturdays and Sundays.

[3] It developed later during the trial that this was the state's witness, David Marsh.

[4] The trial court, *Bieluch, J.*, after an evidentiary hearing before the trial, denied the defendant's motion to suppress the photographic identification.

Marsh in which Marsh, the defendant, and their girl friends were traveling. Marsh gave them permission to search the van. On March 26, 1979, two Manchester detectives picked up the defendant in Colorado and brought him back to Connecticut. The Colorado authorities also turned over to the Connecticut officers a cut-down Remington Wingmaster pump-action shotgun, a twenty-five caliber automatic pistol, ammunition for both weapons and a case for the shotgun, all of which the Colorado authorities had taken from the Marsh van.

During the trial and after a hearing in the absence of the jury, the trial court, over the defendant's objection, admitted evidence concerning a prior uncharged robbery that occurred on February 15, 1979, at the Silver Spur bar in South Windsor. This evidence came in through David Marsh who had already pleaded guilty to first degree robbery and was awaiting sentencing for the Silver Spur incident.[5]

From Marsh's testimony, the jury could reasonably have found the following facts: In 1978, Marsh "sold"[6] to the defendant an intact Remington Wingmaster single-barrel pump-action, twelve-gauge shotgun. The shotgun that the Connecticut police had obtained from the Colorado authorities was the same gun he had "sold" to the defendant "in its original condition" in

---

[5] David Marsh testified pursuant to the state's request, which the trial court granted, that he be given transactional immunity pursuant to General Statutes § 54-47a. During his direct testimony he said that he did not want to testify and that the state indicated it would show consideration if he did testify.

[6] On cross-examination, Marsh testified that "it wasn't a matter of a sale for money. He was working for me, so it was kind of payment for what I already owed."

1978.[7] Although the shotgun was in a different case when he "sold" it to the defendant, Marsh saw Braman load a brown rifle case into Marsh's van as they prepared to leave Connecticut for Colorado.

On the afternoon of February 15, 1979, Marsh and the defendant went to the Silver Spur bar for a beer. The defendant noticed a deposit bag underneath the cash register. The two "briefly discussed" going for the deposit bag. The defendant passed Marsh an automatic pistol and left, returning shortly thereafter with a cut-down shotgun. Marsh went behind the bar and told the barmaid to open the register. The patrons were ordered into a back room behind the bar by the defendant. Thereafter, Marsh and the defendant left.

"As a general rule, evidence of guilt of other crimes is inadmissible to prove that a defendant is guilty of the crime charged against him. *State* v. *Harris,* 147 Conn. 589, 599, 164 A.2d 399 [1960]." *State* v. *Fredericks,* 149 Conn. 121, 124, 176 A.2d 581 (1961); McCormick, Evidence (2d Ed. 1972) § 190; 1 Wharton, Criminal Evidence (13th Ed.) § 170. The rationale of this rule is to guard against its use merely to show an evil disposition of an accused, and especially the predisposition to commit the crime with which he is now charged. See *State* v. *Williams,* 190 Conn. 104, 108, 459 A.2d 510 (1982); *State* v. *Howard,* 187 Conn. 681, 684, 447 A.2d 1167 (1982); *State* v. *Ibraimov,* 187 Conn. 348, 352, 446 A.2d 382 (1982); *State* v. *Barlow,* 177 Conn. 391, 393, 418 A.2d 46 (1979); 1 Wigmore, Evidence (3d Ed.) §§ 215–18. Evidence of other misconduct, however, "may be allowed for the purpose of

[7] There was evidence before the jury that the serial number of the shotgun which the Colorado authorities turned over to detective Vito Perrone, a Manchester detective, was identical with the serial number of a Remington shotgun sold by Caldor's Department Store in 1976 to David Marsh. There was evidence from Marsh which the jury could credit that this was the shotgun Marsh "sold" to the defendant in 1978.

proving many different things, such as intent, identity, malice, motive or a system of criminal activity"; *State* v. *Ibraimov,* supra; or an element of the crime. *State* v. *Falby,* 187 Conn. 6, 23, 444 A.2d 213 (1982).[8]

Our analysis on this issue is two-pronged. First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions. Second, the probative value of such evidence must outweigh the prejudicial effect of the other crime evidence. *State* v. *Howard,* supra, 685; *State* v. *Ibraimov,* supra, 352; *State* v. *Onofrio,* 179 Conn. 23, 28–29, 425 A.2d 560 (1979). The fact that such evidence tends to prove the commission of other crimes by an accused does not render it inadmissible if it is otherwise relevant and material. *State* v. *Ibraimov,* supra, 352; *State* v. *Hauck,* 172 Conn. 140, 144, 374 A.2d 150 (1976); *State* v. *Marshall,* 166 Conn. 593, 600, 353 A.2d 756 (1974). When evidence of this type is offered, "the trial court must still consider whether its prejudicial tendency outweighs its probative value before ruling upon its admissibility." *State* v. *Ibraimov,* supra. "Because of the difficulties inherent in this balancing process, the trial court's decision will be reversed only where abuse of discretion is manifest or where an injustice appears to have been done. E.g., *State* v. *Tucker,* [181 Conn. 406, 416, 435 A.2d 986 (1980)]; *State* v. *Turcio,* [178 Conn.

---

[8] The state claimed the admissibility of this evidence for motive or plan, to show a common design or scheme or method, and to show who Marsh was with at the time of the Silver Spur robbery.

The court charged the jury in part as follows: "The testimony of David Marsh concerning the earlier robbery of the Silver Spur Cafe in South Windsor on February 15, 1979, and the Defendant's participation in it with him is not evidence of guilt that the Defendant committed the March 4, 1979, robbery of the Brass Hammer Cafe in Manchester. Such testimony has been offered only for the purpose of establishing an element of the crime; that is, the threat of use of a shotgun by the Defendant to show a common scheme or system of criminal activity, and for purposes of identification of the Defendant with the robbery."

116, 129, 422 A.2d 749 (1979), cert. denied, 444 U.S. 1013, 100 S. Ct. 661, 62 L. Ed. 2d 642 (1980)]; *State* v. *Hauck,* [172 Conn. 140, 144, 374 A.2d 150 (1976)]. On review by this court, therefore, 'every reasonable presumption should be given in favor of the trial court's ruling.' *State* v. *Ryan,* [182 Conn. 335, 337, 438 A.2d 107 (1980)]." *State* v. *Howard,* supra, 685. In this case the trial court, in its discretion, determined that the evidence offered was relevant and material and that its probative value outweighed its prejudicial effect. See *State* v. *Williams,* supra, 108; *State* v. *Howard,* supra, 685; *State* v. *Ibraimov,* supra.

Turning to the proof of the relevancy prong, we have recently said that " '[t]he device used must be so unusual and distinctive as to be like a signature.' McCormick, Evidence § 157." *State* v. *Ibraimov,* supra, 354. In discussing his "signature theory," McCormick points out that in proffering other crime evidence "[t]o prove other like crimes by the accused so nearly identical in method as to earmark them as the handiwork of the accused . . . much more is demanded than the mere repeated commission of crimes of the same class, such as repeated burglaries or thefts. The device used must be so unusual and distinctive as to be like a signature." McCormick, Evidence (2d Ed. 1972) § 190. This court, however, has taken care to point out that "[w]hen assessing the admissibility of 'other crimes' evidence, the application of a mechanical test determining that the proffered evidence fits within some class of exception to the rule of nonadmissibility, may obscure sight of the underlying policy of protecting the accused against unfair prejudice. That policy ought not to evaporate through the interstices of the classification. The problem is thus one of balancing the actual relevancy of the 'other crimes' evidence in light of the issues and the other evidence available to the prosecu-

tion against the degree to which the jury will probably be roused by the evidence. *State* v. *Holliday,* [159 Conn. 169, 173, 268 A.2d 368 (1970)]; 6 Wigmore, Evidence (3d Ed.) § 1904." *State* v. *Onofrio,* supra, 29.[9]

The state points to the following evidence to demonstrate the similarities between the two robberies: Both establishments were bars; the bars were located in adjoining towns; two persons participated in each robbery; the weapons used in each were a shotgun with cut-down configuration and a small automatic pistol; in both instances the robber with the shotgun assumed the leadership role; the employees and patrons in each instance were ordered into back rooms of each bar; and the incidents were close in point of time. On the other hand, the defendant claims that there is nothing unusual about two bars being the scene of robberies. He also claims that, in contrast to the Silver Spur robbers, the robbers of the Brass Hammer were masked and of the opposite sex. He further argues that the robberies occurred at different times of the day, that the pistol-wielding robber performed different tasks in each instance and that the Brass Hammer robbery was planned, whereas the Silver Spur robbery was spontaneous.

The "other crimes" evidence of the Silver Spur incident was not only relevant to the issue of the identity of the male robber in the Brass Hammer incident, but it was also relevant to an element of the Brass Hammer crime, i.e., the threat of use of a shotgun by the defendant to show a common scheme or system of activity. A permissible inference that the male robber in the Silver Spur incident was the defendant would lead reasonably to the inference that he was the rob-

[9] This is not to suggest that the two-pronged test for the admissibility of "other crimes" evidence is to be telescoped into a test with only one basis as the state's brief appears to do.

ber who threatened the use of the shotgun in that robbery. "The process of construing an inference of [i]dentity . . . consists usually in adding together a number of circumstances, each of which by itself might be a feature of many objects, but all of which together make it more probable that they coexist in a single object only. Each additional circumstance reduces the chances of there being more than one object so associated. The process thus corresponds accurately to the general principle of relevancy." 2 Wigmore, Evidence (Chadbourn Rev. 1979) § 411.

In both robberies the shotgun-wielding robber assumed the leadership role in its execution; he directed the operation including the herding of the occupants into a rear room. In each instance there were two robbers, and the leader was a male brandishing a single-barrel pump-action shotgun unique for its cut-down configuration. Although it is true that two men were involved in the Silver Spur incident, while a man and a woman were the robbers at the Brass Hammer, it must not be overlooked that in both robberies the man with the shotgun did have a companion with a pistol. The shotgun-wielder was the leader in both robberies and whether his companion was a man or a woman, that person with the pistol did not dominate the execution of the crimes. Thus, the difference in gender of the companion with the pistol is hardly a real distinction. Indeed, these circumstances point to the modus operandi. Moreover, the defendant's claim that the pistol-wielding robber did different things at the Brass Hammer than at the Silver Spur lacks substance as a real distinction because there was no resistance of any nature in the Silver Spur incident and the pistols described as used in each instance could reasonably be found to be the same. It is true that the fact that both establishments were bars is not itself distinctive, but

both establishments were in adjoining towns and both bars were robbed within three weeks of each other; see *United States* v. *Davis,* 551 F.2d 233, 234 (8th Cir.), cert. denied, 431 U.S. 923, 97 S. Ct. 2197, 53 L. Ed. 2d 237 (1977); by two robbers using similar weapons with the holder of this unique cut-down shotgun executing the leadership role both times. The distinction the defendant claims for the circumstance that the robbers at the Brass Hammer were masked, while those at the Silver Spur were not, also lacks substance. There was evidence from Mahoney and Curtiss Heinz, the owner of the Brass Hammer, that the defendant often came into the Brass Hammer with Marsh. Thus, it seems highly reasonable that the defendant, upon entering the Brass Hammer to rob it, would particularly endeavor to conceal his identity. Indeed, the incentive to be masked in robbing the Silver Spur, an establishment where the record shows no evidence of such easy recognition, attenuates the distinction claimed for the robbers' being unmasked at the Silver Spur and masked at the Brass Hammer. The difference in the time of day at which each robbery occurred was one factor for the court to consider with all the other claims.

The defendant also claims, as a telling distinction, that the Silver Spur incident was spontaneous whereas the Brass Hammer robbery was planned. We do not agree. While it is arguable that some of Marsh's testimony might so suggest, we are concerned with whether it was spontaneous or planned by the defendant, the person against whom the evidence is offered. Dean Wigmore has said that "[d]esign or plan . . . is the preceding mental condition which evidentially points forward to the doing of the act designed or planned . . . and the design is used evidentially to show its probable commission." 2 Wigmore, Evidence (Chadbourn Rev. 1979) § 300. In recognizing that the

Silver Spur robbery could have been planned and not spontaneous, we refer to the evidence that the defendant went prepared to the Silver Spur not only with the shotgun he used in that robbery, but also with the pistol which he handed to Marsh inside that bar and which Marsh used in that robbery.

Therefore, we conclude that the trial court justifiably decided that there were common features in the two robberies that "can fairly be characterized as sufficiently distinctive to support a reasonable belief that the same person committed both." *State* v. *Ibraimov,* supra, 354; *State* v. *Williams,* supra, 108–109; *State* v. *Howard,* supra, 686–87. Hence, we consider the proffered evidence relevant and material not only on the issue of identity but also on the issue of common design or scheme.

Even though relevant and material evidence is offered in proof of an issue in such a case, the second prong of the analysis requires that "the trial court must still consider whether its prejudicial tendency outweighs its probative value before ruling on its admissibility." *State* v. *Ibraimov,* supra, 352; *State* v. *Williams,* supra. "The process of such a determination is variously called a balancing test; McCormick, op. cit. § 157, pp. 332–33; 6 Wigmore, Evidence (3d Ed.) § 1904, p. 574; 2 id. § 278, 1964 Sup., p. 42; or the exercise of judicial discretion. See *Thibodeau* v. *Connecticut Co.,* 139 Conn. 9, 14, 89 A.2d 223 [1952]; *State* v. *Gilligan,* [92 Conn. 526, 536, 103 A. 649 (1918)]; *Barry* v. *McCollom,* 81 Conn. 293, 299, 70 A. 1035 [1908]; *State* v. *Kelly,* 77 Conn. 266, 269, 58 A. 705 [1904]." *State* v. *Holliday,* 159 Conn. 169, 173, 268 A.2d 368 (1970); *State* v. *Ouellette,* 190 Conn. 84, 94, 459 A.2d 1005 (1983); *State* v. *Ibraimov,* supra.

The record clearly indicates that the trial court did more than just admit the challenged evidence as an exception to the rule. Before admitting such evidence, it conducted a thorough evidentiary hearing in the absence of the jury, heard the claims, and then admitted it for their consideration. We cannot say as a matter of law that the trial court's decision to admit it was an abuse of judicial discretion. See *State* v. *Onofrio,* supra, 29–30. Additionally, it also instructed the jury, as the defendant was entitled, on the limited use of that evidence, safeguarding against its misuse by the jury. See *State* v. *Holliday,* supra, 174; *State* v. *Hoyeson,* 154 Conn. 302, 308, 224 A.2d 735 (1966).

We now turn to the defendant's claim that the trial court erred in admitting the testimony of Mrs. Eleanor Jourdenais, the mother of his girl friend, Kathy Jourdenais, concerning the conduct and state of mind of his girl friend subsequent to the Brass Hammer robbery. The defendant claims that such evidence, which was used to establish his flight, was hearsay as it was grounded upon the nonassertive conduct of his girl friend. We decline to review the merits of this claim because, as the circumstances set forth below reveal, the defendant did not properly raise this issue before the trial court.

At the trial, Eleanor Jourdenais was called as a witness by the state. After testifying as to the relationship between her daughter and the defendant, she was asked by the prosecutor about the activities of her daughter on the weekend during which the robbery of the Brass Hammer occurred. Defense counsel objected on relevancy grounds.[10] Responding to this objection,

---

[10] Defense counsel stated: "I am going to object to this testimony as being irrelevant. I don't know where it's going, but it's irrelevant as to where

the prosecutor explained the relevancy of his inquiry with regard to the issue of flight which he intended to develop.[11] Defense counsel then explained his objection in view of the prosecutor's offer as follows: "[T]he problem . . . is that we're using an innocent party to implicate as it were, a Defendant. . . . The question is if Mrs. Jourdenais, the present witness, knows, has personal knowledge about having seen . . . [the defendant] on March 4, which is the date of the incident, observed his actions or heard him speak, [she] could offer testimony along those lines. . . ." He then went on to state that "I appreciate what the State's Attorney is trying to develop regarding flight, but it has to do with any flight by the Defendant . . . that she has personal first hand knowledge of, not flight by someone else who is not even a party to the action." Following this explanation the court reviewed the defendant's notice of alibi which indicated, inter alia, that the defendant intended to call Kathy Jourdenais as a witness.[12] It then overruled the defendant's objection which prompted defense counsel to state that the witness would thus be permitted to testify "to something . . . which has nothing to do with the notice of alibi. . . ." The court then stated its belief that such testimony "has something to do with . . ." and "could be related to the claim of flight." Defense counsel took an exception.

Thereafter, Mrs. Jourdenais testified that the weekend in question was an unusual one because her

my client was on March the 4th, certainly. Her daughter—she is not on trial in this case, and I don't think that it's relevant where she was. It's where my client was."

[11] The prosecutor stated that he desired to "get into evidence through the mother, what her [daughter's] mental state was, what occurred, and that at that time she expressed her desire to leave the State of Connecticut with the Defendant. . . ."

[12] Kathy Jourdenais did, in fact, testify for the defense and her testimony included the matter of alibi.

daughter did not come home Sunday night, but returned home Monday morning.[13] She was then asked what her daughter's state of mind was on that Monday morning. Defense counsel again objected stating "[i]t's irrelevant. It's totally irrelevant." The prosecutor, in response, claimed that the question was "relevant" on the same grounds described previously. The court overruled the objection and defense counsel took an exception.

Our rules of practice make it clear that when an objection to evidence is made, a succinct statement of the grounds forming the basis for the objection must be made in such form as counsel desires it to be preserved and included in the record. Practice Book § 288. "This court reviews rulings solely on the ground on which the party's objection is based." *State* v. *Manning,* 162 Conn. 112, 118, 291 A.2d 750 (1971). In objecting to evidence, counsel must properly articulate the basis of the objection so as to apprise the trial court of the precise nature of the objection and its real purpose, in order to form an adequate basis for a reviewable ruling. *State* v. *Addazio,* 169 Conn. 416, 427, 363 A.2d 153 (1975); *State* v. *Manning,* supra, 118–19; *State* v. *Gelinas,* 160 Conn. 366, 369, 279 A.2d 552 (1971); *Casalo* v. *Claro,* 147 Conn. 625, 628–29, 165 A.2d 153 (1960). The purpose of such a requirement is apparent since we have consistently stated that we will "not consider . . . evidentiary rulings . . . where no claim of error was preserved for review on appeal by proper objection and exception." *State* v. *Hoffler,* 174 Conn. 452, 461, 389 A.2d 1257 (1978). Moreover, once the authority and the ground for an objection are stated, our review of the trial court's ruling is limited to the ground

---

[13] Mrs. Jourdenais testified that typically her daughter and the defendant spent Friday and Saturday night together with her daughter usually returning home on Sunday.

asserted. *State* v. *Brice,* 186 Conn. 449, 457, 442 A.2d 906 (1982); *State* v. *Manning,* supra, 118; see Practice Book § 3063.

In examining the record, the pertinent parts of which have been set forth above, we find that the defendant failed to raise properly and preserve his claim of hearsay. The record quite clearly indicates an objection to the testimony at issue on relevancy grounds, an offer of proof by the proponent of the evidence as to its relevancy and the court's ruling of admissibility based upon relevancy. Although the defendant asserts that counsel's reference to the fact that the witness was testifying to matters not within her "personal knowledge" suffices as an objection on hearsay grounds, it is quite clear that neither the trial court nor the prosecution was alerted to or interpreted his objection to be based upon anything but relevancy, nor could they reasonably have been expected to do so. Thus, to review the defendant's claim, which has been articulated for the first time on appeal and not before the trial court, would result in a " 'trial by ambuscade of the trial judge.' " *State* v. *Brice,* supra, quoting *State* v. *DeGennaro,* 147 Conn. 296, 304, 160 A.2d 480, cert. denied, 364 U.S. 873, 81 S. Ct. 116, 5 L. Ed. 2d 95 (1960). We therefore do not address the merits of the defendant's second claim of error.

There is no error.

In this opinion PARSKEY, SPONZO and COVELLO, Js., concurred.

PETERS, J., concurred in the result.