******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

SHELDON, J., dissenting. The majority has rejected the claim by the defendant, Christopher Brown, that the trial court erred in admitting evidence of his prior involvement with his alleged accomplice and coconspirator, Frederick Johansen, in committing certain Litchfield car burglaries to prove his motive and intent to commit the offenses charged against him in this case on two related grounds: first, that the challenged evidence tended logically to prove his motive and intent to commit the charged offenses; and second, that the probative value of such evidence on those issues outweighed its prejudicial effect, as measured by the risk that it would cause his jury to find him guilty on a basis other than his proven guilt. Because I cannot accept either of these conclusions, I respectfully dissent.

The majority sets forth the correct rules and principles under which the defendant's claim must be analyzed. "As a general rule, evidence of guilt of other crimes is inadmissible to prove that a defendant is guilty of the crime charged against him. *State* v. *Harris*, 147 Conn. 589, 599, 164 A.2d 399 [1960]. *State* v. *Fredericks*, 149 Conn. 121, 124, 176 A.2d 581 (1961); McCormick, Evidence (2d Ed. 1972) § 190; 1 Wharton, Criminal Evidence (13th Ed.) § 170. The rationale of this rule is to guard against its use merely to show an evil disposition of an accused, and especially the predisposition to commit the crime with which he is now charged. See *State* v. *Williams*, 190 Conn. 104, 108, 459 A.2d 510 (1983); *State* v. *Howard*, 187 Conn. 681, 684, 447 A.2d 1167 (1982); *State* v. *Ibraimov*, 187 Conn. 348, 352, 446 A.2d 382 (1982); *State* v. *Barlow*, 177 Conn. 391, 393, 418 A.2d 46 (1979); 1 Wigmore, Evidence (3d Ed.) §§ 215–18. . . . *State* v. *Braman*, 191 Conn. 670, 675, 469 A.2d 760 (1983). The fact that such evidence tends to prove the commission of other crimes by an accused does not render it inadmissible if it is otherwise relevant and material. Id.; *State* v. *Ibraimov*, supra, 352; *State* v. *Hauck*, 172 Conn. 140, 144, 374 A.2d 150 (1976); *State* v. *Marshall*, 166 Conn. 593, 600, 353 A.2d 756 (1974). Such evidence is admissible for other purposes, such as to show intent, an element in the crime, identity, malice, motive or a system of criminal activity. *State* v. *Ibraimov*, supra, 352; *State* v. *Falby*, 187 Conn. 6, 23, 444 A.2d 213 (1982); *State* v. *Brown*, 169 Conn. 692, 701, 364 A.2d 186 (1975).

"Our analysis of whether evidence of the uncharged misconduct is admissible is two-pronged. First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions to the propensity rule. Second, the probative value of such evidence must outweigh the prejudicial effect of the other crimes evidence. *State* v. *Braman*, supra, 191

Conn. 676; *State* v. *Howard*, supra, 187 Conn. 685; *State* v. *Ibraimov*, supra, 187 Conn. 352; *State* v. *Onofrio*, 179 Conn. 23, 28–29, 425 A.2d 560 (1979). The primary responsibility for conducting the prejudicial-probative balancing test rests with the trial court, and its conclusion will be disturbed only for a manifest abuse of discretion. *State* v. *Morowitz*, 200 Conn. 440, 446, 512 A.2d 175 (1986); *State* v. *Mandrell*, 199 Conn. 146, 152, 506 A.2d 100 (1986); *State* v. *Shindell*, 195 Conn. 128, 136, 486 A.2d 637 (1985); *State* v. *Johnson*, 190 Conn. 541, 548–49, 461 A.2d 981 (1983); *State* v. *Tucker*, 181 Conn. 406, 416, 435 A.2d 986 (1980); 1 F. Wharton, Criminal Evidence (13th Ed.1972) § 241. [W]e will indulge in every reasonable presumption in favor of the trial court's ruling. *State* v. *Mooney*, [218 Conn. 85, 131, 588 A.2d 145, cert. denied, 502 U.S. 919, 112 S. Ct. 330, 116 L. Ed. 2d 270 (1991)]; *State* v. *Sierra*, 213 Conn. 422, 435, 568 A.2d 448 (1990); *State* v. *Braman*, supra, [677]; *State* v. *Johnson*, supra, 549; *State* v. *Howard*, supra, [685]; *State* v. *Ryan*, 182 Conn. 335, 337, 438 A.2d 107 (1980)." (Internal quotation marks omitted.) *State* v. *Figueroa*, 235 Conn. 145, 161–63, 665 A.2d 63 (1995).

Where I part company with the majority is in its application of the foregoing rules and principles to the challenged evidence of the Litchfield car burglaries, as admitted by the trial court to prove the defendant's motive and intent to commit the offenses charged against him in this case. Although evidence of certain types of prior misconduct is admissible to prove both motive and intent, motive and intent are distinct and different exceptions to the general rule prohibiting the use of prior misconduct evidence against a criminal defendant. Therefore, the application of these exceptions to the challenged evidence must be separately considered.

Proof of motive is a well established exception to the general rule prohibiting the admission of prior misconduct evidence against a criminal defendant when the probative value of such evidence on that issue outweighs its prejudicial effect. Although proof of motive is not typically required to obtain a criminal conviction, it can furnish powerful and appropriate evidence of guilt on the traditional theory that, if the defendant had a special reason or incentive to commit the charged offense in the manner alleged and proved—against the particular victim, to accomplish a particular result, or otherwise—then it reasonably can be inferred that he acted in furtherance of that motive by committing that offense. *State* v. *Lopez*, 280 Conn. 779, 795, 911 A.2d 1099 (2007) (prior misconduct that tends to show defendant harbored hostility toward victim of violent crime admissible to establish motive). Whether the defendant's motive is one of revenge, self-protection, self-enrichment or otherwise, evidence of the defendant's involvement in prior misconduct tending to establish that motive is admissible to prove both that he engaged

in the conduct claimed to constitute the charged offense and that he did so with the intent required for commission of that offense, provided its probative value on that issue is found to outweigh its prejudicial effect. Where, then, the connection between proffered evidence of the defendant's prior misconduct and his motive to commit the charged offense is sufficiently strong that a properly instructed jury can be counted on to confine its use of the evidence to that purpose, such evidence is properly ruled admissible on that issue as an exception to the general rule. See *State* v. *Marshall*, supra, 166 Conn. 599–601 (evidence of murder suspect and murder victim's joint involvement in notorious gang rape as to which victim had considered cooperating with state ruled admissible to prove defendant's motive to kill victim).

Proof of intent is also a well established exception to the general rule prohibiting the use of prior misconduct evidence to prove the guilt of a criminal defendant. Such evidence is admissible to prove the defendant's intent, provided it is relevant and its probative value on that issue outweighs any prejudice naturally arising from its tendency to cause the jury to find the defendant guilty for reasons other than his proven guilt. Importantly, however, evidence admitted under the intent exception to the general rule can only be used to prove that, if the defendant engaged in the conduct claimed to constitute the charged offense, he did so with the intent required for commission of that offense. *State* v. *Meehan*, 260 Conn. 372, 396, 796 A.2d 1191 (2002) (emphasizing distinction between using prior misconduct evidence to prove an alleged act and to prove an alleged intent); see also *State* v. *Baldwin*, 224 Conn. 347, 355–56, 618 A.2d 513 (1993) (prior misconduct evidence irrelevant and inadmissible to prove defendant's subsequent *act of possession*, but relevant and admissible to prove *intent* with which that subsequent act, if otherwise established, was committed, particularly the *intent to sell*); *State* v. *Tucker*, supra, 181 Conn. 415 (trial court properly admitted evidence of prior acts of child abuse against same victim to prove specific intent to murder and lack of accident, but not to prove act of murder itself).[1] Such evidence cannot be used to prove that the defendant actually engaged in the underlying, allegedly criminal conduct, unless it was also admitted under a different exception to the general rule which permits substantive use of such evidence to prove the defendant's acts as well as his intent due to the direct relationship between the prior misconduct and the charged offense. Prior misconduct that has such a direct relationship to the charged offense as to permit evidence of such misconduct to be used to prove the defendant's acts as well as his intent includes, for example, misconduct tending to prove the defendant's motive to commit the charged offense; see *State* v. *Marshall*, supra, 166 Conn. 599–601; misconduct tending to prove

that the charged offense was a "signature crime," committed in such a distinctive manner as to identify the defendant as its likely perpetrator; see *State* v. *Figueroa*, supra, 235 Conn. 163–64; and misconduct tending to prove that the charged offense was committed as part of a system of criminal activity. See *State* v. *McFarlane*, 88 Conn. App. 161, 164–65, 868 A.2d 130, cert. denied, 273 Conn. 931, 873 A.2d 999 (2005).

Although evidence of prior misconduct that is admitted solely to prove the defendant's intent cannot lawfully be used to prove that he actually committed the acts claimed to constitute the charged offense, such evidence nonetheless carries with it the risk that, despite its expressly limited purpose, it will lead the jury to find that the defendant is a person of bad character who has, and has acted on, a propensity or predisposition to commit similar offenses. This problem is especially significant when, as is often the case, there are generic, albeit nonsignature, similarities between the prior misconduct and the charged offense. Great care must be taken in admitting evidence of prior, unrelated misconduct to prove the defendant's later intent, for as Professor Tait and Judge Prescott have observed, "when the prior uncharged misconduct is 'extrinsic,' namely, separate and distinct from the crime charged, the use of uncharged misconduct to prove intent is . . . practically indistinguishable from prohibited propensity evidence. . . . [T]o use misconduct at one time to prove an intent to do the same thing at another time borders on the forbidden theme of 'once a thief always a thief.' " (Citation omitted.) C. Tait & E. Prescott, Connecticut Evidence (4th Ed. 2008) § 4.19.6, p. 164.

In light of these concerns, the admission of prior misconduct evidence solely to prove a defendant's intent to commit a charged offense is properly limited to cases in which there is a genuine dispute as to whether, if the defendant actually engaged in the conduct claimed to constitute the charged offense, he engaged in such conduct with the mental state required for conviction of that offense. *State* v. *Gilligan*, 92 Conn. 526, 536–37, 103 A. 649 (1918); see also *State* v. *Vessichio*, 197 Conn. 644, 664–65, 500 A.2d 1311 (1985), cert. denied, 475 U.S. 1122, 106 S. Ct. 1642, 90 L. Ed. 2d 187 (1986). Such is the case, for example, when the defendant concedes that his allegedly guilty conduct has been proven, but claims that he engaged in such conduct by accident or mistake or with some other innocent purpose. See *State* v. *Perry*, 195 Conn. 505, 522, 488 A.2d 1256 (1985) (evidence of other robberies in which defendant participated probative in negating his claims of duress and ignorance of companion's criminal intent). In that event, proof of the defendant's guilty purpose when he engaged in similar misconduct in the past can logically be used to disprove his current claim of accident, mistake or other innocent purpose when he so acted in the case at bar without having any prejudicial

impact on the undisputed nonissue of whether or not he actually engaged in the allegedly criminal conduct. When, by contrast, there is no genuine dispute that, if the defendant actually engaged in the conduct claimed to constitute the charged offense, he did so with the mental state required for commission of that offense, evidence of prior misconduct cannot be admitted to prove his intent because, having no probative value on that issue, its only logical use by the jury would be to support the illicit inference that the defendant committed the charged offense because he had the propensity or predisposition to do so. See *State* v. *Meehan*, supra, 260 Conn. 395–97.

The majority begins its analysis of the relevancy of the challenged evidence on the issues of motive and intent by noting, unobjectionably, that intent is an essential element of each of the crimes with which the defendant was charged in this case. On this score, it notes, more particularly, that to convict the defendant of burglary in the third degree or larceny in the third degree, the two substantive crimes with which the defendant was charged as an alleged accessory to Johansen, the state was required to prove that the defendant acted with the mental state required for commission of a larceny, which it refers to colloquially as the intent to steal. It further notes that to convict the defendant of conspiracy to commit burglary in the third degree or conspiracy to commit larceny in the third degree, the two remaining, inchoate crimes with which he was charged as Johansen's alleged coconspirator, the state was required to prove that he acted with two related intents: first, the intent to agree with Johansen to commit each essential element of the substantive crime which was the alleged object of the charged conspiracy, here, either burglary or larceny, as appropriate to the charge; and second, as part of its proof of his intentional agreement with Johansen to commit that substantive crime—the intent required for commission of that substantive crime—here, to reiterate, the intent to steal.

Thereafter, however, instead of explaining how evidence of the defendant's involvement in the Litchfield car burglaries tended logically to prove that he acted with any such necessary intent, by establishing his motive to act with that intent or otherwise, the majority addresses the relevancy of the challenged evidence to the defendant's motive and intent simply by paraphrasing and agreeing with the following argument advanced by the state: "[T]he defendant's prior dealing with Johansen in the Litchfield car burglaries, which involved some acts of parallel behavior in terms of the relationship between Johansen and the defendant in the manner in which the underlying crimes were committed, provided some evidence of the defendant's motive and intent to commit the subject crimes with Johansen. We agree with the state."

Here, although the majority suggests that there are certain "acts of parallel behavior" between the defendant's admitted conduct in Litchfield and his alleged conduct in Ellington approximately six months later, it offers no specifics as to what those parallels are or why, in its judgment, they tend to prove that the defendant had the motive or intent to conspire with Johansen to commit the crimes charged against him in connection with the burglary at the Ellington home of Gerald Hargrave. Instead, it offers only brief, and in my judgment unconvincing, explanations of its reasoning in reaching its previously stated conclusions.

As for the defendant's motive to commit the charged offenses, the majority adds only that it agrees with the state's further argument that "the admission of evidence of the defendant's past misconduct with Johansen provided some evidence of the defendant's motive to entice and conspire with Johansen to commit the Hargrave burglary and larceny because Johansen was indebted to the defendant, who had previously posted bail for him due to past arrests." "As noted," the majority continues, "the jury heard from Johansen that he was indebted to the defendant before [the date of the Hargrave burglary] February 4, 2010, and that when the defendant conspired with him for the commission of the burglary and larceny, the defendant indicated that he would expect a small finder's fee. Although the defendant argues that there was no evidence that Johansen repaid him, Johansen's failure to satisfy that obligation to the defendant serves only to create an implication that the defendant's financial motive in enticing Johansen may not have been realistic and that his expectation may not have been fulfilled." I disagree.

Implicit in the foregoing observations is the suggestion that the defendant's motive for enticing and conspiring with Johansen to commit the Hargrave burglary was to obtain repayment of a debt which Johansen owed to him, at least in part, for posting his bail following his arrest for the Litchfield car burglaries. Respectfully, I believe that this theory is unsupported by the evidence.

First, although Johansen did indeed state to the police that at the time of the Hargrave burglary he owed the defendant money for previously bailing him out of jail, he never stated that he had incurred any part of that unpaid debt in connection with the Litchfield car burglaries. The evidence did not show that Johansen was released on bail after his arrest in Litchfield, much less that, if he was so released, it was the defendant who posted his bail. Absent such a connection between the Litchfield car burglaries and the debt from Johansen to the defendant, which assertedly motivated the defendant to entice Johansen to commit the Hargrave burglary, evidence of the defendant's involvement in committing the Litchfield car burglaries was completely

irrelevant to his motive to recruit and conspire with Johansen in the manner claimed.

Second, consistent with the absence of any proven connection between the Litchfield car burglaries and the debt Johansen owed to the defendant at the time of the Hargrave burglary, Johansen never claimed, either in his statement to the police or in his trial testimony, that part of the defendant's inducement to him to commit the Hargrave burglary was to lower the amount or modify the terms of repayment of any such preexisting debt. Instead, as the majority itself acknowledges, the defendant's only proposed compensation in connection with the Hargrave burglary was claimed to have been a small finder's fee which he was to have been given for setting up the burglary and giving Johansen the opportunity to commit it. Johansen, on the other hand, was to have kept most of the profits from the burglary because, as the defendant reportedly put it, Johansen would be doing "the dirty work . . . ." There was nothing in the evidence to suggest that any part of Johansen's small payment to the defendant from the profits of the Hargrave burglary was to have been made not as a finder's fee, but as a partial repayment of Johansen's preexisting debt to the defendant for previously bailing him out of jail.

Third, even if evidence had been adduced at trial to suggest that part of Johansen's debt to the defendant had been incurred when the defendant posted his bail after the Litchfield car burglaries, such an evidentiary link between the two crimes, had in fact there been one, would not have justified the state in introducing evidence of the defendant's involvement in committing those unrelated offenses to prove him guilty of the Hargrave burglary. The complete story of the defendant's alleged recruitment of Johansen to commit the Hargrave burglary in order to repay a debt he owed to the defendant for posting his bail in connection with the Litchfield car burglaries could readily have been told in all necessary detail without revealing that the defendant had played any role in committing the Litchfield car burglaries. For all of these reasons, I disagree with the majority that the defendant's involvement in the Litchfield car burglaries had any logical tendency to prove that the defendant had a debt repayment motive for enticing and conspiring with Johansen to commit the Hargrave burglary.

Alternatively, the majority submits that the evidence was relevant to prove the defendant's intent. The majority's only explanation of its reasoning as to its asserted relevancy for this purpose appears in footnote 9 of its opinion, as follows: "In the case at hand, evidence of the defendant's past relationship with Johansen in the commission of the Litchfield car burglaries was relevant to the issue of intent. That is, such evidence is not admitted to prove relationship as an end; rather, the

relationship between the defendant and another actor as past misconduct is some evidence of the defendant's intent to conspire with that same person. Contrary to the defendant's claim, the evidence is not admitted to prove the defendant's propensity to commit crimes; rather, it provides some evidence of an intent to form a conspiracy with that particular person." I do not agree.

Here, as previously noted, although the majority suggests that there are "certain parallels" between the defendant's admitted conduct in Litchfield and his alleged conduct in Ellington approximately six months later, it offers no specifics as to what those parallels might be or why, in its judgment, they tend to prove that the defendant intended to conspire with Johansen to commit the crimes charged against him in connection with the Hargrave burglary. This, I think, is not surprising, for there is no direct connection between the Litchfield car burglaries and the Hargrave burglary, and the only parallels between them are very general and superficial, while the distinctions between them are apparent and very significant. Both criminal episodes, to be sure, involved break-ins and thefts, generic burglaries and larcenies. As previously noted, however, the Litchfield car burglaries targeted cars of unknown victims for random valuables, while the Hargrave burglary targeted the residence of a known victim, Hargrave, for prescription drugs and, ultimately, household electronic equipment. Both episodes, moreover, were allegedly committed by Johansen as a principal offender with the defendant as his accessory. The Litchfield car burglaries, however, involved the defendant as an active participant in the commission of crimes proposed to him by Johansen, whereas the Hargrave burglary allegedly involved the defendant only as an absent setup man for a break-in that he had allegedly proposed to Johansen. There was thus nothing about the manner in which the two sets of crimes were instigated or perpetrated that supported the logical inference that, if the defendant committed the former, then logically he intended to commit the latter. At most, evidence of the defendant's involvement in committing the Litchfield car burglaries tended to show that he was a thief, who had previously committed property crimes of the same general sort together with Johansen.

Reducing the majority's explanation for its contrary conclusion to its essence, one finds a single troubling rationale: if, on a prior occasion, in different circumstances, the defendant and Johansen conspired together to commit the Litchfield car burglaries, then logically it can be inferred from their prior relationship that they later renewed or continued that relationship by conspiring once again, six months later, to commit the otherwise unrelated Hargrave burglary and larceny. That inference, however, is nothing more than an inference of guilt based upon propensity or predisposition, under the forbidden logic of "once a thief, always a

thief."

The challenged evidence does not tend to prove that the defendant intended to steal property from Hargrave, as required to convict him of each charged offense, nor does it tend to prove his alleged intent to agree with Johansen to commit all of the essential elements of burglary or larceny, as required to convict him of conspiracy to commit either such substantive offense in this case. Instead, it bears only on the defendant's identity as one of the perpetrators of the charged offenses on the theory that since he once before conspired with Johansen to commit generically similar crimes, then he intended to do so again in this case.

This is not a case in which there is a genuine dispute as to whether, if the defendant engaged in the conduct claimed to constitute the four charged offenses, he acted with the intent required for commission of any such offense. According to Johansen's police statement, the defendant contacted him with information that the Hargrave home was full of prescription drugs and other valuables which he could simply go in and take on the date of the burglary, that Hargrave, who was dying, would not be home at that time, and that the defendant would arrange to have the door to the home left open for him. Johansen further stated that the defendant told him that if he agreed to do "the dirty work" by committing the break-in and theft of Hargrave's property, he could keep most of the profit as long as he paid the defendant a small finder's fee. If the defendant engaged in such conduct, as alleged, then surely he did so with the intent to steal Hargrave's property, for otherwise he would not have made plans for its removal in secret or referred to the break-in and taking of property as "the dirty work . . . ." If, by the same token, the defendant agreed with Johansen to commit the proposed crimes in order to realize a profit they would later share, then just as surely his agreement with Johansen to commit the resulting burglary and larceny was intentional, for he obviously had the financial incentive to work together with Johansen to commit those crimes.

There is nothing in the record, moreover, to show that the defendant ever engaged in any ambiguous, potentially incriminatory conduct in relation to the Hargrave burglary which he later claimed to have engaged in by accident or mistake or without a guilty purpose. He was never seen in Johansen's company at any time before, during or after the break-in, and was never shown to have possessed or been in the presence of the fruits or instrumentalities of the break-in, either before or after its occurrence. Most significantly, he never claimed or was shown to have had any potentially innocent discussion with or in the presence of Johansen concerning Hargrave's illness or absence from his home, much less the presence in the home of drugs or

electronic equipment, that might have given Johansen the incentive to commit the ensuing burglary and larceny entirely on his own initiative. Had he so claimed, then evidence of his and Johansen's prior misconduct in Litchfield might conceivably have been relevant to rebut the defendant's claim of innocence when discussing what amounted to an available opportunity to commit, in the case at bar, a potentially profitable break-in. Here, however, the defendant consistently denied *all* involvement in planning, setting up or otherwise facilitating the Hargrave burglary, innocent or otherwise, and thus never defended himself against any of the offenses charged against him based on a claim of accident, mistake or other innocent purpose, which evidence of his prior misconduct in similar circumstances might appropriately have been used to rebut. In short, this is not a case in which evidence of such misconduct shed any light at all on the defendant's intent to commit the Hargrave burglary.

Concluding, as I have, that evidence of the defendant's involvement in the unrelated Litchfield car burglaries fails to support a logical inference of his motive or intent to commit or conspire with Johansen to commit the Hargrave burglary, I must next determine if the prejudicial effect of such evidence outweighed its probative value. The majority focuses its discussion of prejudice on factors affecting the admissibility of prior misconduct evidence when it is shown to have at least some discernible relevance to issues potentially justifying its admission under one or more established exceptions to the general rule. When it does, of course, the question presented for the court's consideration is whether it should be excluded despite its logical relevance because of its collateral tendency to arouse the jury's passions, to waste its time, to divert its attention from the central issues of the case or unfairly to surprise the party against whom it is offered. *State* v. *James G.*, 268 Conn. 382, 398, 844 A.2d 810 (2004). The majority concludes that the trial court did not abuse its discretion in determining that the probative value of the evidence outweighed its prejudicial effect.

I disagree with the majority's conclusion because, as previously explained, I reject its underlying premise that the evidence had any relevance at all on the limited issues of motive and intent for which it was admitted. The prejudice arising from the admission of such evidence in the absence of any such potentially appropriate use was simply and obviously its tendency to support the forbidden inference that the defendant is a person of bad character who has the propensity or predisposition to commit similar crimes. I conclude that the evidence should not have been admitted because its significant prejudicial effect far outweighed its nonexistent probative value on the issues of motive and intent.

Having concluded that the court improperly admitted

evidence of the defendant's prior misconduct and that the probative value of the evidence did not outweigh its prejudicial effect, I turn finally to the question of whether the court's decision constituted harmful error. I conclude that it did.

"When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful . . . . [W]hether [the improper admission of a witness' testimony] is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the [improperly admitted] evidence on the trier of fact and the result of the trial. . . . [T]he proper standard for determining whether an erroneous evidentiary ruling is harmless should be whether the jury's verdict was substantially swayed by the error. . . . Accordingly, a nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Internal quotation marks omitted.) *State* v. *Favoccia*, 306 Conn. 770, 808–809, 51 A.3d 1002 (2012). On the contrary, "[a]ny improper evidence that may have a tendency to . . . influence the judgment . . . of the jury . . . cannot be considered as harmless." (Internal quotation marks omitted.) *State* v. *Onofrio*, supra, 179 Conn. 32.

The defendant argues that the evidence in this case was not particularly strong, and that without the additional, improperly admitted evidence of his prior misconduct, the jury likely would not have returned a guilty verdict against him. He claims that the jury found him guilty not on the evidence of his guilt in the Hargrave burglary, but rather on the illicit inference of his propensity or predisposition to commit property crimes based upon the evidence of his prior misconduct. I agree with the defendant.

The state's evidence linking the defendant to the charged crimes was weak. Over the course of three days of trial, the state presented the testimony of thirteen witnesses, eleven of whom in no way implicated the defendant in the Hargrave burglary[2] and two of whom— Johansen and Frederick Colby—recanted their prior written statements insofar as they had implicated the defendant in the Hargrave burglary.[3] In light of the manifest weakness of the state's case,[4] it is not surprising that it devoted substantial time in the presentation of evidence and final argument to the improperly admitted evidence of the defendant's prior misconduct. The state's evidence proving the defendant's and Johansen's

joint commission of the Litchfield car burglaries was lengthy and detailed. It consisted of three live witnesses who testified over a period of two trial days and read two complete witness statements into the record. In all, such evidence of the defendant's involvement in the Litchfield car burglaries consumed forty-five pages of trial transcript.

Moreover, in its closing argument, the state specifically argued to the jury the impact of the improperly admitted evidence of the defendant's prior misconduct as follows: "If you recall, this case has some similarities to the Litchfield case. Six months before this happened, in August of 2009, the defendant and Johansen are arrested for breaking into ten cars. And you do have a copy of the defendant's statement about that incident.

"Specifically, the defendant states that a person by the name of Jeff . . . solicits him, calls him and says, I need you to break into some trucks and steal some chain saws. Jeff also says I'll make sure that the doors to the trucks are left open and the defendant could steal those chain saws. And the defendant was supposed to get three thousand dollars for stealing the chain saws once he brought them back to Jeff . . . .

"However, when they arrived to the scene and tried to get into these trucks for this particular tree service company, the trucks were left open, but there were no chain saws.

"That is when they moved on to plan b. . . . Johansen and the defendant decide, we'll break into some cars and make money that way. And so . . . Johansen goes to the different areas after . . . the defendant . . . drops him off at one location, breaks into cars. He gets back inside the vehicle, and then they drive to another location.

"And it was at that point that . . . Johansen is caught, and he gives a statement to the police, and he also implicates the defendant. And the defendant is eventually arrested. . . .

"Six months later, February 4, 2010—in that area— the defendant now is the one making the solicitation. He requests that . . . Johansen break into the home to steal Percocets and Oxycontin and anything else he wanted.

"Just like Jeff, he tells him when to go, February 4. Just like Jeff, he tells him he would arrange to have someone leave the door open. And he tells . . . Johansen . . . that he . . . could profit from breaking into the home.

"By this point, the defendant has a mistaken belief that as long as someone else committed the criminal activity, he can't get into trouble. The laws of our state hold the planner of a criminal agreement—of an agreement to commit a crime, accountable, just as the

one who actually does it."

The theme throughout the state's closing argument was that the defendant mistakenly believed that as long as Johansen did the "dirty work," he would not be found guilty of conspiracy to commit or accessory to burglary or conspiracy to commit or accessory to larceny.[5] This use of the prior misconduct evidence, as argued by the state in its closing argument, amounted to nothing more than a claim that if the defendant committed a similar crime with Johansen in the past, he likely committed such a crime with him on this occasion, in effect showing that he is the sort of person who would do so. Not only was this evidence not admitted for that purpose but it was not admissible for that purpose because the crimes were not shown to have been committed as part of a common scheme or plan or to have had such unique commonalities between them as to make proof of the commission of the one crime evidence of identity as the perpetrator of the other. The Litchfield car burglaries were not committed pursuant to a common scheme or plan for the obvious reason that the alleged plan to commit those crimes was not concocted until the defendant and Johansen found no chain saws in the truck that had been left unlocked for them. The whole purpose of the car burglaries was for Johansen "to make some real money" to pay for the gas that he had used to drive his car to Litchfield that night. Meanwhile, the Hargrave burglary, as described in Johansen's statement, was not conceived of or undertaken for any purpose related to the Litchfield car burglaries. The crimes were not signature crimes, moreover, because they were committed in different ways, against different kinds of victims, in different communities, and had little else in common except the technical names of the offenses allegedly committed and the identities of Johansen and the defendant as two of their alleged perpetrators.

Against this background, the harm suffered by the defendant was substantial. The jury's attention was directed at trial and in the state's closing argument to evidence that showed that the defendant was a person who had previously committed the Litchfield car burglaries, thus suggesting the defendant's propensity or predisposition to commit similar crimes, upon which the jury relied, substantially affecting the verdict. From this inference, the jury was tempted to find the defendant guilty based on the illicit inference that he had acted in accordance with his propensity or predisposition. This is precisely the type of inference that is intended to be avoided by the general rule prohibiting evidence of a defendant's prior uncharged misconduct, as it "borders on the forbidden theme of 'once a thief always a thief.'" C. Tait & E. Prescott, supra, § 4.19.6, p. 164.

It is true, of course, that the trial court issued repeated

curative instructions to the jury that the disputed evidence concerning the Litchfield car burglaries was to be considered only on the issues of motive and intent, and that if the jury found that it had no relevance to those issues, then it was to be disregarded. In addition, the court specifically instructed the jury that the evidence was not to be used as a basis for inferring that the defendant was a person of bad character. Notwithstanding such instructions, I conclude that the court's error in admitting the disputed evidence was not harmless. I reach this conclusion for two reasons. First, the challenged evidence was so extensive and so centrally featured in the state's evidence and closing argument that it would have been virtually impossible for the jury to ignore. Second, in the absence of any explanation from the court as to how precisely the evidence could have been used on the issue of intent, I think it is highly likely that the jury used the evidence precisely as the state argued it to them and of which the majority has approved, for the illicit purpose of inferring that if he once agreed with Johansen to commit certain generically similar property crimes, then he likely did so here as well.

In summary, I conclude that the prior misconduct evidence was improperly used to support the illicit inference that the defendant committed the Hargrave burglary because, as shown by his involvement in the Litchfield car burglaries, he had a propensity or predisposition to commit such crimes. Because, for that reason, there can be no substantial assurance that the challenged evidence did not affect the jury's verdict, I would reverse the defendant's conviction on all counts and order a new trial.

[1] Professor Wigmore has described the proper use of evidence of prior bad acts or offenses admitted to show intent as follows: "It will be seen that the peculiar feature of this process of proof is that the *act itself is assumed to be done*,—either because (as usually) it is conceded, or because the jury are instructed not to consider the evidence from this point of view until they find the act to have been done and are proceeding to determine the intent. . . . [T]he attempt is merely to discover the intent accompanying the act in question . . . ." (Footnote omitted.) 2 J. Wigmore, Evidence (Chadbourn Rev. Ed. 1979) § 302, p. 245.

[2] On the first day of trial, the state presented five witnesses, none of whom implicated the defendant in the burglary. Norma Hargrave's only testimony regarding the defendant was that she knew him as her nephew's son. Gerald Hargrave testified that he did not know the defendant. James Hargrave testified that he knew the defendant only as his "relative." Ellen Riemer testified that on the day of the burglary, she was driving home and saw two "young men" in their "late teens to mid-twenties," who appeared to be securing a tarp to an older white sedan and "stuffing things under" it, but did not identify the defendant as one of these two men. Kozubenko testified that he knew the defendant through other friends, but not closely, and at no time during his testimony did he implicate the defendant in the burglary. Moreover, Kozubenko specifically stated that the defendant was not present at Hargrave's home at the time of the burglary and that he did not speak to the defendant on the day of the burglary.

On the second day of trial, in addition to Johansen and Colby, the state called Robert Given, a resident state trooper in Ellington, who testified that he had assisted Ellington Resident State Trooper Veronica Carpenter in the execution of the warrant to search Kozubenko's residence for the items stolen from Hargrave's home, but did not offer any evidence about the defendant's alleged involvement in the burglary of Hargrave's home.

Similarly, none of the state's witnesses on the third day of trial implicated the defendant in the Hargrave burglary. Carpenter read Colby's and Johansen's recanted statements into the record in their entirety. Ellington Resident State Trooper Bart Alexander briefly testified that he was one of the officers who first responded to the report of the burglary of Hargrave's home, but did not testify as to the defendant's alleged involvement in the burglary. Steven Koss of the Manchester Police Department testified about his oral interviews of Colby and Johansen regarding the burglary of Hargrave's home and testified that both Colby and Johansen mentioned the involvement of a "cousin" in the Hargrave burglary, but could not recall if either of them ever mentioned the defendant by name.

[3] Contrary to his written statement to the police, in which he had implicated the defendant in setting up the burglary, Johansen testified that the defendant was not involved in the burglary, did not advise him that there would be drugs in Hargrave's home, and did not tell him that the house would be left unlocked for him on February 4, 2010. Like Johansen, Colby, at trial, recanted that portion of his written statement in which he had implicated the defendant in the burglary. Colby explained that he "didn't know anything about" the burglary and "didn't even have a statement to give without [Johansen] telling [him]" the names of those allegedly involved.

[4] The lack of evidence presented to the jury supporting the state's theory of the case is particularly noteworthy. Specifically, the state's theory that the defendant conspired with Johansen by informing him that there would be "piles of drugs" at Hargrave's home and that Johansen would be able to enter the home on February 4, 2010, because the defendant would have someone leave the door open, is unsupported by the evidence. To the contrary, Johansen and Kozubenko arrived at the home on that date not only to find the doors and windows locked, but also rid of drugs. There also was no evidence supporting the state's theory that the defendant had conspired with Johansen in order to receive a finder's fee or repayment for an outstanding debt owed to him. No evidence was presented establishing that after the burglary, Johansen gave the defendant any amount of money or stolen goods as payment for any purpose—either as a finder's fee or as a partial payment for previously bailing him out of jail. There also was no evidence that the defendant was ever present at Hargrave's home on the day of the burglary.

Similarly, none of the state's forty-seven photographic exhibits tended to show the defendant's presence at Hargrave's home. In fact, the only evidence that ever implicated the defendant in the burglary was the initial statements of Johansen and Colby, which were recanted in relevant part at trial.

[5] The state also argued to the jury that the live testimony of Johansen and Colby as to the defendant's noninvolvement in the burglary was unreliable because "they seem to have a poor recollection of what took place when the state would ask them questions about the crime," and they "testified in a poor manner" by not "look[ing] up when answering any of the questions" and mumbling. The state also argued to the jury that Johansen and Colby "[b]oth had a strong bias to testify falsely on behalf of the defendant" because "Johansen owed the defendant money for bailing him out" and is the defendant's first cousin, and that Colby "had a strong bias to lie" because the defendant "is, again, a good friend of his." The state claimed that "both of these individuals . . . weren't concerned about the consequences for lying on the [witness] stand because they are already incarcerated." The state also asserted that Colby's and Johansen's "testimony was unreasonable," in that they claimed to have been high when they gave their statements, but testified that portions of their statements still should be believed, even though some other portions implicating the defendant were false.